0590. Appellant ready to proceed. You may. Your Honor, Jennifer Willis for the plaintiffs, Roger Stringer, Kimberly Heyer, and Zachary Stringer. As this Court knows, this comes before you on a 12B6 motion that was granted by the trial court. The issue that the trial court focused on was whether Mr. Stringer, and really the opinion is confined to Mr. Roger Stringer, had manifested due diligence in determining the defect in the gun that killed his son. And I'm assuming all of you are familiar with the facts and don't need a recitation of that. I would like to briefly, if it's okay, because it helped me a lot and maybe it will assist the Court go through the timeline, excuse me, of what happened. In December of 2008, Mr. Roger Stringer purchased the Remington 700 rifle at issue as a Christmas present for his son, Zach Stringer. The recitation in the complaint is that Remington knew at the time of the sale of the rifle that there was a defect in the trigger. Where is that allegation in the complaint? I can give you the page. That's on page 15. Defendants had actual knowledge of the problems at the S&P at the time it was sold to plaintiff Roger, and particularly the rifle's propensity to unexpectedly discharge without pulling the trigger. What is the fact supporting the allegation? I understand you can plead the defect, but we're in federal court now, so we have to... The facts, I understand that. And again, it's a 12B motion, so for purposes of this hearing, this is true. But there have been now reports that Remington was having reports of misfires as early as 2006, which is... I'm sorry, I want to pause you. I want to hear all of that. I just want to go step by step. So we're on 12B-6. We have to take the allegations, and the complaint is true, but that only applies to the non-conclusory allegations. So simply stating one element of a cause of action, that is, Remington knew of a defect, that's not a fact. That's a conclusion. So what would be the... You need something above that. Can we describe the defect? Sure. And then later we say that Remington had actual and or physical knowledge of the design deficiencies prior to the death of Justin Stringer. Now, we have a lot of documents referenced in the petition that are appropriate for consideration, both by the trial court who didn't consider them and by this court. What are the specific documents that don't apply to the old trigger, but do apply to the XMP trigger? Well, the recall... I see a citation to a website, but I don't see any citations to a document. The recall, for instance, from 2014 in which Remington admitted that there was a defect in the trigger and urged all of the owners of the gun to send them back. There's a statement from Remington, and this goes to the fraudulent concealment. I don't want to get out of line, so tell me exactly what you want me to address and I'll try to do that. So I'm trying to understand what is the facts properly alleged in the complaint. And you have alleged a defect, and then we've alleged knowledge of the defect. Now, saying Remington knew of the defect is not a fact. That's a conclusion, right? So you would need some sort of fact that would suggest that they knew of the defect. Then after we've done that, we would move to the next fact, which is that they fraudulently concealed the knowledge. We know that... And I don't see any of those facts, so I'm asking you to help me understand. Okay. Hang on one second. Plaintiffs have learned that Remington was receiving customer complaints from the field involving reported malfunctions with the XMP trigger as early as 2008. That's on page 6 of the complaint. That is a fact, not a conclusion. That is absolutely a fact. Okay. And we know that the recall in 2014, Remington, unlike the Pollard settlement with the Walker fire trigger in which Remington continued to deny all responsibility but settled the case, Remington made an affirmative statement in the recall that these triggers can fire without the... I'm sorry, these firearms can fire without the trigger being pulled. And therefore, they are dangerous and need to be returned for a retrofit. So we have that fact. That's in 2014, I understand. But you're asking me for facts about Remington's knowledge and about the defect. So what is the fact pled in the complaint that Remington fraudulently concealed the defect from 2008 until 2014? I'm glad you asked me that question. Okay. One of the documents that is referenced in the complaint is the 2010 piece, Remington under fire, and Remington's response to that. And Remington's response says... And I'm sorry, which trigger are we talking about? Are we talking... Because some of these are about Walker and some of them are about XMP. That piece was about the Walker triggers, but they were also producing the XMPs at that time and had been for four years. Okay. But this isn't about... But this statement by Remington, we have been accused of conflating the Walker trigger and the XMP trigger. And I think that you will find that this statement conflates them, but it's Remington doing it. And this is what it says. The Model 700, including its trigger mechanism, no differentiation, has been free of any defects since it was first produced. And despite any careless reporting to the contrary, the guns used by millions of Americans has proven it to be a safe, trusted, and reliable rifle. So they're saying that it's free of defect. This is at a point at which they know that they're getting complaints from the XMPs firing without the trigger being pulled. They don't limit the statement to the Walker trigger. They say the 700 rifles. And by this time, you've got four years of the XMP, as well as the whole history of the Walker. So this statement made in 2010, you'll say, well, you know, what does that apply now? It's still on the internet. I downloaded this yesterday. So obviously, in order to have fraudulent concealment, it has to be after the claim accrues, which would be June 11th, 2011, right? Right. Okay, so the claim accrues on June 11th, 2011. So then the next question is, what fact do we have after June 11th, 2011, that would fraudulently conceal the knowledge of the defect? This. I thought that was from 2010. It's still there. I downloaded this yesterday. It's still out on the internet for everybody to see. Remington never took this down. This statement is still a statement by Remington that can be accessed by anyone using Google. A statement that they made in 2010. And have never retracted. So the product recall in 2014? The product recall in 2014 was originally limited to Remington's website only, and for a sustained period of time. The only reason that it was ever made more publicly available was that that composed a part of the Pollard settlement. It was a negotiated part of the settlement, and the recall would be widely disseminated. But at the time they recalled it in 2014, unless you were on the Remington website, you didn't know about the recall. They didn't do mailers. They didn't do advertising. They didn't do ads in the gun magazines like was done on the Walker trigger recall. All they did was stick it on their website. So are you going to discuss the particular facts that make it more difficult for Zachary? Well, there's something else I'd like to discuss about Zachary, and the trial court didn't deal with it, and I think we could have dealt with it better. Zachary was 15 years old at the time of the shooting. In Mississippi, as Judge Graves knows, there's tolling of the statute of limitations during minority to the age of 21, and then three years further. So Zachary's claims can't be barred by the statute of limitations because he was only He had been in jail. He'd been in jail, but he was a minor. Without any access to whatever Remington might have published. He had been in jail. The argument that we made about him being in jail dealt more with the due diligence and his access to the due diligence to find out anything about the gun. But let's come back to this. He's a minor, and his claims don't prescribe, as we say in Louisiana, until he's 24 years old, and the suit's filed when he's 22. And the judge totally ignored that. I mean, Judge Graves knows about a thousand times more about Mississippi law than I do, but I did read the statute. I don't know about that, but I appreciate that you think I did. But that's the reason that Zachary, one of the many reasons that Zachary's issue is different. I was going to move on to due diligence, but if you want to hear some more about fraudulent concealment, I'm happy to. I have one more question, if we're ready to move on. Do you have a case, obviously a Mississippi case would be great, but from any court anywhere in the United States, that has recognized a fraudulent concealment claim after a public product recall? Because as I see it, the public product recall is on what day? It's on... April 2014. I think it was the 4th. Yes. April 11, 2014. So even if you had pled fraudulent concealment in the complaint, and again, it's not obvious, but let's just assume it for the sake of this question. Suppose that you plead fraudulent concealment from the date of June 11, 2011, the claim on April 11, 2014. What case from any court would allow us to say that the fraudulent concealment exists after Remington publicly recalls the product? I don't think there is one. Okay. Thank you. And it's not that I didn't look. No, I looked too. Yeah. I think that there are recalls and recalls, and I was one of the objectors in the Pollard case, and this was a big issue, the scope of the representative, one of the objectors. And the sticking it on your website doesn't work. You have to have, I mean, there is a whole body of case law that say if you want to give notice, and usually it's in the class action context, I get that, but that if you want to give notice, you have to give something that's reasonably calculated to get to the people you want to get it to. And in Pollard, one of the ways they did that was to run ads in, for instance, gun and ammo. And Remington could have easily done that here, but it didn't. They just stuck it on the website, and that was it. And that was done April 11, 2014. Right. And so that was three years before the original three-year statute of limitations ran. And the question is whether that was calculated to reach people like Mr. Stringer, like Ms. Heider, who's kind of been ignored because she's not been as active in the litigation, was reasonably calculated to reach them within that time period. And, I mean, again, are these... Can you buy guns on their website?  You can't. Remington doesn't sell direct, it only sells through dealers. And I guess the question is, can you do that, and how much of this can be decided on a real 12B motion? And we've cited a whole bunch of cases that say none of this is appropriate for resolution at this stage. Moving on to due diligence, there was a full-blown criminal trial, as the Court knows, and a conviction that was later affirmed by the Mississippi Supreme Court. The crime lab forensics examiner, Lori Beal, examined the gun. And she testified at trial that she did a variety of tests and that none of those tests caused the gun to fire. And she concluded from that that the gun was not malfunctioning. That's her testimony. It's pretty straightforward. So I guess my question is, if you have the prosecutor relying on that testimony and the judge relying on that testimony, and ultimately the Mississippi Supreme Court, when it affirmed the conviction, relying on that testimony, why can't Roger Stringer rely on that testimony? That, to my mind, is due diligence. He accepted, reluctantly, the conclusions of the crime lab examiner, and only when he found out later that the recall had happened, and there's a lot of things we don't know. What would have happened if Remington had said to the crime lab examiner, if they even knew about the criminal trial at that point, we've had some fire without pulling the trigger. Maybe you should look at this more carefully. That's speculation. I know the Court doesn't want to speculate. But that's something that we will never know. But what we do know is that everybody accepted that testimony. She's a qualified forensics expert. She did a full examination, not just of whether the gun would fire, and testified that the gun was in good working order. So I don't see how that helps. I don't see how it helps the case. I mean, products are recalled all the time, but without the benefit of a forensic expert doing pounds of forced trigger pull testing on rifles. The fact that someone independently studies it and says this rifle is okay would seem to vitiate the claim, not help it. I think that it goes to the due diligence issue. Did he act as a reasonable person under the circumstances, which is what the Mississippi case law says? And if he had, you know, what would he have done? Hired a forensics examiner. But the state of Mississippi had one. Can't he rely on that? She was testifying for the people of Mississippi. Again, I'm not trying to be flip, but that's, I think that that's a reasonable reliance. I think it satisfies the due diligence requirement. I understand the recall is a separate issue, but I have to kind of go down my list. So I think that he acted reasonably. I think I'm out of time. You can conclude. He acted reasonably in terms of the information that was available at that time. He was, you know, he had one son dead and another incarcerated. Their life was in shambles. The forensic examiner was telling him that the gun was okay, and I think he accepted that testimony as any reasonable person would have done. Thank you. All right. Thank you, counsel. You may proceed. May it please the court, counsel, I'm Andy Lodson. And along with Bobby Miller, we represent the defendants Remington, DuPont, and SGPI. This case involving alleged accidental discharge of a Model 700 rifle with an Exmark Pro trigger is time barred by the Mississippi three-year statute of limitations. The district court got it right. The fraudulent concealment doctrine does not apply to save this untimely claim. And I think I'll be the third lawyer to mention the word timeline today. But timelines are very important when it comes to analyzing whether things have been done timely. And the timeline discussed by Ms. Buckley was incomplete, and I want to complete that timeline. Now, and these are information directly from the complaint. When did this accident occur? Because that, under Mississippi law, is when a cruel occurs. The clock starts ticking. When somebody must act to investigate whether they have claims. In a personal injury, wrongful death claim with an obvious injury like a gunshot wound death, under Mississippi law, that occurs on the date of injury, and that was June 11, 2011. Now, in a standard operating procedure case, that statute of limitations expires on June 11, 2014. What else is in this plaintiff's complaint about pertinent details of information publicly known between those two timeframes? As Judge Oldham brought up, the recall. And there is not a case in this country that holds that following a product recall that's publicly announced, that there can be fraudulent concealment, active affirmative conduct. And the public announcement was posting it on their website. That was the public announcement. It was posted on their website, easily accessible by Google, which Roger Stringer did do on March 12, 2015. It was also made public record in the Pollard Class Action litigation within days of the publicly announced recall and news media coverage related to the recall. Plaintiffs in their own complaint, and this gets into the timeline, information directly from their complaint. In 2010, they plead that a YouTube video was posted for, and as they describe YouTube, for the entire world to see demonstrating a Model 700 rifle with an Exmark Pro trigger mechanism firing in an accidental manner without a trigger pull. That type of information affirmatively pled in their complaint does not help the plaintiffs in terms of making a timely claim. It doesn't help Zachary, who's underage and in prison? Judge Weiner, I'm glad you brought that up because you mentioning that and then Ms. Buckley mentioning the word minor tolling, minor savings, is the first time I have ever heard that phrase. It's not in the court record. It's not in any of the briefing. It wasn't discussed in the lower court. That issue has been waived. But let's talk about Zachary Stringer, him of all people. If the crux of the plaintiff's claim is that Remington fraudulently concealed from them, including Zach, that the rifle could fire without a trigger pull, and yet that is what Zach said happened, he possesses every bit of knowledge of the handling and the function of the firearm. He was the one who had it in his hands at the time of discharge. He went as far in the defense in the criminal matter to exert that as his defense in the case. This was an accident. I didn't pull the trigger. He was represented by, I assume, competent counsel, nothing otherwise has been pled, to advance that very defense throughout his criminal trial. This was an accident. It was the rifle. It was not me. That was from inception. And the forensic experts. They rejected that, didn't they? They did reject that. Now, up until that point, that was... Because Remington hadn't come forward with the information. In terms of come forward, some sort of duty of disclosure to the Stringers, and I think we need to be... To the world. Whether Remington came forward or whether Remington had assessed the situation yet, it's not at issue in the criminal case, number one, because there's no mention in the criminal opinion on this that Remington had any knowledge of what was going on with the Stringers case, number one. Because they had kept it secret. But nobody ever contacted Remington. In terms of secrecy, a duty of disclosure, and there are many Mississippi cases that talk about this, the duty of affirmative disclosure of facts that may support a particular plaintiff's claim are limited to fiduciary relationships or relationships of close confidence and trust between usually business associates, business partners, and a lawyer and his client, a doctor and his client, something of those natures. But to suggest, and I'm glad you brought the question up, Judge Wiener, that Remington had any part of the Stringers trial such that it dissuaded anybody on that jury, anybody in the courtroom, the judge, the prosecutor, the defense counsel, the forensic expert to make findings and do as they did has not been pled and is really an absurd concept. Remington had no knowledge of what was going on. There's never been an allegation otherwise in this complaint. In terms of the state forensic examiner who essentially did vitiate the plaintiff's substantive claim in this case, there's no allegation that Remington had any influence on that person, had any communications with that person. No, it lacked communication. You know, I've shot Remingtons all my life, and it's, with the possible exception of Winchester, has the best reputation in the country, if not the world. And for them not to have brought anything out about this trigger at the time of Zachary's criminal trial and for the rest of the time he was in jail until they finally did is a significant factor in this case. While it may be a factor in this case, it doesn't match up with any of the elements to prove fraudulent concealment tolling. There is no affirmative duty for Remington to inform the Stringer family directly that they maybe have a cause of action against Remington. No, but what about the tolling while he's a minor in prison? First time I've heard it is today, which I don't have to say the word again.  That issue was not addressed in any way, shape, or form in the lower court, except, and I'm going to go as far as to not call it just waiver, it's abandonment. There was mention on page 168 of the record in some briefing before the trial court, I believe it was the opposition to Remington and the other defendants' motions to dismiss, that Zach's claims might, quote, That was the extent of it. No citation to any case, no analysis, no effort put forward whatsoever. It was abandoned in briefing. For whatever strategic reason, the plaintiffs decided to not advance that argument in the trial court and then certainly not brief it on appeal and then only bring it up today at oral argument, screams of waiver problems. And waiver in and of itself has longstanding traditions in fairness on how things are litigated. So to the extent Zach, and I would point back to the complaint itself, there is not one mention in the complaint of Zach being a minor. The only mention of Zach in any sort of age reference is on the record of page 33, paragraph 3 of the complaint. Zach is an adult. He's an adult at the time that the claim is filed. Now, in terms of what type of case this is, what type of case, this is a wrongful death claim. Plaintiffs plead very specifically, this is a wrongful death lawsuit filed for the death of Justin Stringer. Mentions of some sort of stand-alone claim for Zach are not present, certainly not in paragraph 18 of the complaint where they describe their own complaint for everybody to see. Wrongful death claim. To even suggest going down the realm of the minor tolling statute, set aside the waiver issue. Have to look at what Mississippi law says about wrongful death. There's a wrongful death statute. I'll provide it for you quickly. Section 11-7-13 of the Mississippi Code. And if you read case law and if you read the plain language of that statute, it provides for one wrongful death claim on behalf of the decedent, in this case Justin Stringer. And all beneficiaries can join in plaintiffs of that claim. We're getting really far outside of the briefing, but I will continue with this because it's an important point. I think that if you read the cases about the Mississippi Wrongful Death Act and the one wrongful death rule, essentially, one wrongful death claim rule, you'll find that when a person of majority, an adult, brings a claim and it is otherwise time barred on behalf of the state as a whole and all beneficiaries sitting inside of that state, including somebody like Zach Stringer, who at the time of the filing of that complaint is over 21 years of age, you'll find that the wrongful death claim is time barred as a whole. Now, there is a lot of movement and back and forth inside of the wrongful death case law in the state of Mississippi. None of that has been raised properly before this court. None of it was waived in front of the district or discussed in front of the district court. Waiver, and I would go as far as to suggest abandonment, which is a doctrine that goes deeper than just waiver. That suggests that the plaintiffs knew about it, had contemplated it, and for whatever strategic reason decided not to pursue it. But for them to bring it up for the first time at oral argument on appeal is something this court should not take lightly. Turning back to, and I mentioned that timeline, the paragraph of the plaintiff's complaint that is detrimental to them in many respects, not just the affirmative allegations that there was a recall of the subject product in April of 2014. Plaintiffs go further. They mention the Pollard litigation by name. That case was on file from 2013 onwards. And then if you look at the public record available in Pollard, Doc 59, in April of 2014, within days of the announcement of the recall on the Exmark Probe, that allegation, notice of the recall itself, and affirmative allegations are added in an amended complaint in Pollard about the Exmark Probe being defective and unreasonably dangerous and the basis of an economic loss claim in the Pollard litigation itself. Matters of public record, Your Honor, with respect to Judge Graves, with respect to going beyond just the recall notice, are inside of a federal class action lawsuit as a matter of public record, and of which plaintiffs' counsel in this case say they were a part of. There are other. It's not just that the plaintiffs' counsel were involved in some way in Pollard. If you look at Doc 149 in that case, Roger Stringer wrote a letter in October of 2016 to the court about his situation. That's a matter of public record as well, inside of the Pollard litigation. The court can take judicial notice of those types of things, of their existence. Now, in terms of the diligence prong that we've talked about a little bit already, the body of cases, in a personal injury case where there's a gunshot wound, an injury, and death, it's not a discovery rule case. This is not a latent disease or injury that sits inside of the body, nobody knows about it, and then you, to accrue, have to know of both the injury and its cause. No, the statute of limitations and accrual under Mississippi, the applicable statute here, which is 15-149 sub 1, not sub 2, which is the discovery rule. Sub 1, accrual occurs at the moment of injury. Not only does it accrue at the time of injury, you have Zach affirmatively saying, now he's got a few different stories that he gave to law enforcement following his investigation of him in a criminal matter, but he says, and the plaintiffs plead in their complaint in this case, that Zach maintained he did not pull the trigger, that there was an untoward event with the product. In other words, the product malfunctioned. Whether people believed him or not, he gave all the information necessary to excite inquiry into this matter. And there was an inquiry, and a forensic expert said it didn't happen, said the gun wouldn't just automatically go off without any pressure being applied to the trigger. Isn't that what happened? To the extent there was an investigation, the forensic expert testifying on behalf of the State certainly was not testifying in Zach's interest. Well, the forensic expert doesn't testify unless the forensic expert has some basis for offering testimony. We're not just talking about a forensic expert testifying for the prosecution. The forensic expert testified because the forensic expert did some testing. Isn't that right? That is true. And that testing said that what Zach claimed happened didn't happen with that gun. That's what the testing, at least according to the forensic expert, that's what the testing revealed. And apparently the jury relied on that. Judge relied on that. Conviction was upheld by the Supreme Court, right? Correct. Now, there's one person who didn't rely on it, Zach. He's the plaintiff in this case. I mean, that's very important. In terms of who did an investigation of potential claimants. So he should have hired another forensic expert? He should have insisted on getting another forensic expert? Keep getting them until I get one that says what I say happened. I can't say what Zach should or should not have done with advice of his legal counsel at trial. But if his legal counsel and him thought there was a problem with the rifle, I would think it was their duty to investigate on their own and not rely on the State's expert. This does underscore a point that I really need to make in the Fraudulent Concealment Doctrine, bringing these facts back to the two prongs. Active, affirmative conduct by Remington. Remington is not the State of Mississippi. That is a problem that undercuts the argument that the State's analysis of the rifle. But we're arguing about due diligence and when they should have discovered that there was a problem with the gun. We are talking about that. We are. And there's an affirmative allegation in plaintiff's complaint that does everything that this court and both the trial court need to know on diligence and whether it was timely or not. Paragraph 26 of the complaint, March 14, 2015. Roger does a Google search, a mere Google search. The first allegation of any diligence in looking at any civil claims. But that's not attributable to Zachary. It goes on and says that this is the first instance that any of the defendants had any knowledge of this, plural. It also goes on to say that Roger secured the services of an independent expert, an independent consultant. Perhaps it was the very same type of forensic expert that Judge Graves alluded to. We don't know for sure. But this is the first act of diligence by anybody in the Stringer family to investigate whether there are any civil claims. And let's not limit what the duty to investigate civil claims is limited to. It's not just Remington. There are others who could potentially be involved in this. To fire a firearm, there must be a cartridge loaded into the chamber. Was something wrong with the ammunition? That's also a product claim. Who supplied Zach with the firearm itself? Negligent entrustment. Who taught Zach how to use the firearm in an unsafe manner or safe manner? That's a negligence claim in and of itself. There are other potential claims that needed to be investigated. The duty to do so was triggered at the moment of death under Mississippi law. And the only allegation of diligence of any sort of civil investigation of claims is in paragraph 26 of the complaint. It lays out everything that needs to be known. And what happens when the diligence falls outside of the three-year window to bring the claim? That's not due diligence. The claim had already expired. It expired on June 11, 2014. Counsel, amongst the things that aren't pled in the complaint, I noticed that there's no allegation that this product, this actual, the rifle with this serial number was part of the product recall. They allege the serial number, but not the actual, that it was part of the recall. Is Remington aware of whether it was actually recalled? It's, based on our understanding, it would be in the general time frame of the recall. But Remington would know by serial number. Correct, based on date of manufacture. But what do you do about Zachary's minority in being in jail? In terms of, Remington didn't put Zach in jail. That's the bottom line. Not as far as discovery. Well, if there's some sort of wrongful death claim that Zachary's trying to bring, Mississippi law is going to bar that. No, he's not bringing wrongful death. He's bringing wrongful imprisonment. Some sort of quasi-1983 claim on behalf of, against Remington? I don't see any claim in this pleading, in this complaint, that suggests a 1983-style... No, it's a suspension of the running of the statute of limitations. To the extent that that has never been briefed before this court, or before the lower court, and potentially abandoned before the lower court, I would argue that there's a huge waiver problem there. Now, in terms of... I'll close with this. That a personal injury claim, where there's a readily apparent gunshot wound injury, and then allegations of fraudulent concealment, but no interaction between the plaintiffs and the defendants. There's no fraud. And there's a series of cases, including from the Ninth Circuit and from the First Circuit, the Ninth Circuit cases we discussed in our briefing, where the Ninth Circuit looked at this very issue with Remington Rifles, and rejected the plaintiff's fraudulent concealment tolling arguments. I see I'm out of time. Thank you for your time today. We ask that the district court's opinion be affirmed. Thank you, counsel. Rebuttal. Let me set the stage here. You have Remington, who is an icon of American guns. Who would think they'd ever produce a gun, knowingly put it on the market, knowing for years that it has a defect? And that's what we now know they did, because of the disclosure of the documents and because of the recall. And in that context, you have to understand, this case is a little different than a lot of the cases that we've all been citing, for this reason. Here, Remington went out and not only put out that their gun was not defective to numerous people who asked. They did the other. They said this is the most reliable, trustworthy gun on the market. They said that in any number of things that we attached, and it's included in the 60 Minutes piece. It's included in their response to the CNBC piece. And I differ with opposing counsel. I think that you might be able to say, I have a defective gun, and we're just going to let them go out and not say a word. But when you go out and actively say, this is the most reliable, trustworthy gun in the world, and you publish that everywhere and you inundate the market with it, that you have now taken an affirmative step and you've crossed the line. You're now in a different world than where you don't have a fiduciary duty. And I would cite the court to a case that we cited that I know is not exactly on all points, but in the Alexander v. Wyeth case, I hate to say that word because it makes it sound like I'm lisping. In that case, what did they find? They found that the defendant had gone out to doctors and written letters saying how great this product is, how great you can use it for all these off-market uses, knowing full well that it caused cancer. And that court did what this court should do. They should find, whoa, that's a no-no. You crossed the line. That's fraudulent concealment. You've crossed the line. When you go out, you don't need to necessarily tell Mr. Stringer the gun's not defective. You've told everybody that has asked the gun's not defective. And we know what they said about the Stringer case. They actually replied in the 60 Minutes piece, and that's before the court, where they replied with respect to this. This gun could not have malfunctioned. And that was after the recall. But go back to the ---- help on the due diligence requirement. Because if there are news reports, as you have said, all over the place, that there are problems with the gun, why wouldn't that put the plaintiffs in this case on some sort of notice to do some sort of investigation, especially when they're dealing with the incredibly tragic circumstances of the injury and death in this case? Great question. I was about to go there too. I think that a couple of things. One, it's under the circumstances. And there was due diligence on day one in all around the criminal matter. It was investigated by the gold standard, you know, the crime lab of the state of Mississippi. Mr. Stringer, a power line worker, and his son who's incarcerated, and the families in the turmoil that you can imagine from essentially losing two sons, they obviously relied on the crime lab. That doesn't work for the prosecution. I mean, the crime lab in every case in every state issues exculpatory evidence every single day. I mean, we've got to look at them as the gold standard. And they issued a report saying that the gun was not malfunctioning. Unfortunately, they didn't know the precise mechanisms that caused these guns. They don't go off when you drop them. That's not what makes them go off. They go off when you turn the safety off or when you lift the bolt and various things that are all documented and they're set forth in the complaint. So that's one thing. You've got to look under the circumstances. Secondly, we have the case Wilson versus retail credit. And in that case, they basically walked away from the due diligence. They said, you know what? If you do due diligence and it's not going to reveal the underlying fraudulent concealment, the truth, then we can walk away from due diligence. And I would tell you here that the Stringer's due diligence was surrounded. In that criminal action, it was the focus of everybody. We're about to put a young man in jail under these circumstances. And the prosecutor, everyone, looked at that issue hard. And so there's your due diligence. Then you go down the line and Mr. Stringer says, okay, you know what? It didn't happen the way Zach's saying, and goes down the line. He has his ear to the ground, and what does he find out from somebody? You know what? These guns do go off the way your son does, and he does what anybody would do. He goes on the Internet. Candidly, I'm a hunter. I have guns. I don't go and go to the Google sites every day or ever to look for this. I know about this because I'm involved in this case. And I think that's the truth for most people. What do you say to their assertion that they're hearing for the first time here today that the statute of limitations ought to be told because of Zach's minority? I would tell you that, first, it was raised in the lower court, and I think that if you read all of the pleadings in this case, it says constantly, the minor Zach, the minor Zach, the minor Zach couldn't do this. A 15-year-old shot his brother. There's not one word of it in the blue brief, not one word about minor tolling. You'd say that there's an erroneous conflation between Zach and the other plaintiffs, but nothing about this tolling for minors under Mississippi law. Not one word. I don't dispute that. But what I would say is we do try to draw the distinction between Zach and the others. And I would also say this. That's a legal protection. I mean, he's a minor under the law. There's a statute that protects him. And the fact that I'm a bad lawyer, what can I say? It's not in the brief. I hear you. But I think that we got there in enough ways, and it's a statute. It's like saying, guess what? You didn't cite this case, so now you can't rely on it. That would be crazy. What if I didn't cite the prime case that wins for me? You would raise it. You'd say, you know, my law clerk found this, and here it is. And I think that's where it is. And I don't think that the weakness in my briefing necessarily ought to kill this. And I do think that it's important that we made those distinctions about Zach's claims aside for the minority, and that is that he was convicted. Your time has expired. You've got a couple of sentences to conclude. Yes, sir. Again, I think that this case is different because the due diligence was applied early on and later, and because Remington so flooded the market with positive things about this gun that it misled everybody, and that's where the fraudulent concealment came from. Thank you very much. We'll take the matter under advisement. Thank you, sir. We'll call our next case.